## Joseph Bryant *et al. versus* Commonwealth In-
## surance Company.

If the fact to be found by the jury consists of distinct integral parts, some of law and some of fact, which must exist and be proved before such mixed fact can be said to be legally established, a verdict finding the fact, without the evidence of such legal prerequisites, would be a verdict against law, and should be set aside as often as returned.

Thus, where in an action on a policy of insurance on a cargo, three juries successivo ly returned verdicts for a total loss, when from the evidence it was manifest that the loss did not amount to fifty per cent. of the value of the property, the third verdict was set aside as a verdict against law.

In the case of shipwreck, the master is not at liberty to sell the cargo merely on the ground that a sale will be the best thing for all concerned and that a prudent owner, if present, would sell under the same circumstances ; but he will be justified in sell- ing, only by a legal necessity.

Where a cargo insured from Havana to Castine, in Maine, was wrecked on the coast of Virginia, about forty miles from Norfolk, but was taken from the vessel without being damaged and might have been sent by land to Norfolk and thence by water to Castine, for less than fifty per cent. of its value, but the master, instead of sending it to its place of destination, sold it on the beach, it was *held* that the insurers were not liable for a total loss.

*Held* also, that the premium which would be required to insure against the risks of plunder and of weather during the transportation by land and water from the place of wreck to the place of destination, were not to enter into the calculation in ascer- taining whether the damage amounted to fifty per cent. of the value, for those risks were covered by the policy.

Where a vessel was stranded on the coast of Virginia, and the cargo was landed without damage, and was not of a perishable nature, and might have been kept in reasonable safety until the owners and insurers, who lived in Massachusetts, could

be heard from, it was *held,* that the master had no authority to sell the cargo and break up the voyage, without waiting until the owners and insurers could be consulted.

ASSUMPSIT on a policy of insurance, dated November 11, 1824, by which the defendants caused the plaintiffs to be insured 9,600 dollars on the cargo and 400 dollars on the freight, valued at 800 dollars, of the schooner William King, at and from Havana to her port of discharge in the United States. The plaintiffs claim for a total loss.

The cause was tried at November term 1831, before *Wilde* J. It appeared at the trial, that the schooner sailed from Havana on November 30, 1824, bound for Castine, in Maine, having on board 500 bags of coffee, 50 boxes of sugar and 6 chests of tea, the whole of which, as well as a part of the vessel, was the property of the plaintiffs. After being several days at sea, she was compelled by stress of weather, the death of the mate and sickness of the crew, to bear away for the port of Charleston for repairs and for á new crew, and she arrived there on the 7th or 8th of December. Certain repairs were there made and a new crew shipped, and to defray the expenses the master sold 40 bags of coffee for $ 660·80, exclusive of the duties and charges. The schooner sailed from Charleston with the remainder of her cargo, on the 18th or 19th of December, and on the 28th she was cast ashore, by stress of weather, at the Washwoods, on the coast of Virginia, about forty miles from Norfolk. On the second or third day afterwards all her cargo was landed on the beach, with but little if any damage, and it remained there until the 11th of January 1825, when it was sold, as was the schooner also, by the wreck master, by order of the master of the schooner, for the benefit of the owners, underwriters and others concerned. The cargo and vessel were advertised for sale in the Norfolk newspapers of the 3d of January. Having completed the sales and received the proceeds, the master went to Norfolk, where he paid, on the 15th of January, to the collector of Norfolk, the duties on the cargo. He has ever since, as it is believ .ed, kept himself fraudulently concealed, and has not paid the proceeds of the cargo and vessel to either the plaintiffs

or the defendants. The news of the stranding was first learned by the plaintiffs on the 8th of January, by a letter from the master, which was communicated to the defendants, and on the same day an abandonment was tendered to them and by them refused.

The defendants resisted the claim for a total loss, on the ground that the cargo might have been transported from the Washwoods to Castine at an expense less than one half of its value.

Many witnesses were examined in the case.

John Cornick, called by the plaintiffs, testified that he had been commissioner of wrecks ever since 1817 ; that the cargo of the William King was landed the first night and the next day after she was stranded ; that it was piled and secured under a tent made of the sails of the vessel ; that the master was introduced to him in the afternoon of the 29th of December ; that the master said he wished the witness to take charge of the property as commissioner ; that the master said he had made up his mind to sell the property ; that the witness knew of no exception to the practice of selling wrecked cargoes on the beach ; that he had never known a master to transport a cargo from the Washwoods ; that wrecks occur every year on the beach between Cape Henry and Currituck ; that he thought the master did right to sell ; that he should have advised him to do so ; that it is the commissioner's duty to assist wrecked captains, procure hands and transport the cargo to a place of safety ; that the witness should feel himself bound to put such property, if required, in a place which he should think perfectly safe ; that if the master had been lost, the witness should have put the cargo on the hills, as was done, and secured it in a tent ; that the property was in the keeping of a guard on the beach ; that the witness should keep property so situated, eight or ten days where it was, and then have moved it to some house ; that he would not leave it on the beach four weeks, he might think it safe there for twenty days ; that it was safe there unless there should be an extraordinary storm ; that the nearest place where it could be put under cover was about fourteen miles from the place of

wreck ; that this cargo was well protected and was trans-
ported to Norfolk cheaper than any he had known ; that
he was willing to contract to transport it for a cent and a
half a pound, the owners taking the risks of weather and
plunder ; that he advised the master that ten-days' notice of
the sale was sufficient, in reference to his owners as well as
to purchasers ;. and that owners have come on not unfre-
quently and stopped wrecked sales.

James G. Williamson testified, that at the time of the
wreck he was acting as deputy under Cornick, and that upon
inquiry made of him by the master, he gave it as his opin-
ion, that at that season of the year, from the badness of the
roads, and the exposed state and weight of the cargo, it
would be best to sell the property.

There was much evidence in the case as to the cost of
transportation to Norfolk, some witnesses stating that it would
have cost the master about three cents a pound, and some
stating that the purchasers actually gave about a cent and a
.half a pound ; and as to the property being in danger from
the weather, and being injured by rains, and being exposed
to plunder ; and as to the cost of carrying the cargo to
Castine, its port of destination ; and as to the necessity and
the expediency of selling the property on the beach.

The plaintiffs drew up a statement of the loss according
to their view of the evidence, as follows : —

Transportation of 121,690 lb. from Washwoods to Nor-
    folk, say 3 cts. per lb., is  .    .    .    .    .    $ 3650·70
Commissions and charges at the Washwoods
    as per account of sales, saving and land-
    ing cargo &c.    .    .    .    .    $ 919·80
Insurance from Washwoods to Norfolk against
    plunder and weather, including the risk
    at the Washwoods against weather, being
    winter season, and transportation in open
    carts, say 25 per cent. on $ 11,851·31,
    amount of invoice of cargo on board when
    stranded, the proceeds of the sales of 40
    bags of coffee at Charleston, S. C., being
    deducted    .    .    .    .    .    2962·83

        Amounts forward    .  .    3882·63    3650·70

| | | | |
|---|---|---|---|
| Amounts forward . . | 3882·63 | 3650·70 | Bryant<br>v.<br>Common-<br>wealth<br>Ins. Co. |
| Storage, wharfage and labor at Norfolk, and truckage to vessel for re-shipment to Castine . . . . . . | 120·00 | | |
| Commissions for bonding or paying the duties, advancing the money to pay the transportation from Washwoods to Norfolk, and other expenses, and attending to re-shipment from Norfolk for Castine, say 2½ per cent. on $ 17,379·81, being amount of invoice with duties added . . . | 434·49 | | |
| Insurance from Norfolk to Castine, being a winter passage, say 1¼ per cent. on $ 17,379·81 . . . . . | 217·25 | | |
| Freight from Norfolk to Castine, being a winter voyage and no return freight to be procured, say ½ cent per lb. . . . | 608·45 | | |
| | | 5262·82 | |

$ 8,913·52

| | | |
|---|---|---|
| Insurance against plunder and damage from weather, from Washwoods to Norfolk, on $ 5,528·50, being amount of duties at risk, the same being bonded or paid at the custom-house, which increased the amount at risk, although it did not increase the amount which the owners would receive from sales of the cargo, at 25 per cent. . . . . | 1,382·12 |

$ 10,295·64

| | | |
|---|---|---|
| Amount of invoice of coffee and sugar | $ 12,279·62 | |
| "    "    " 6 chests of tea (part of outward cargo) returned , | 232·53 | |
| | | 12,512·15 |
| Deduct proceeds of 40 bags of coffee sold at Charleston | | 660·84 |
| Value at Washwoods per costs . . . . | | $ 11,851·31 |

The item of 919·80 includes a charge of $ 590·05 for commissions on the sales at the Washwoods.

The jury were instructed, among other things, that if transporting the cargo to Castine would not have cost fifty per cent. of the value after deducting the freight saved, it was nevertheless a case of total loss, if there was a necessity

Bryant
v.
Common-
wealth
Ins. Co.

for a sale ; and that to determine whether that necessity ex
isted, they would inquire whether a sale was the best thing
for all concerned, and whether a prudent owner, if present,
would have sold under the same circumstances ; that if the
sale was necessary, that constituted a total loss, without any
abandonment, and that the proceeds in the hands of the mas-
ter were at the risk of the underwriters.

The jury returned a verdict for a total loss ; and the de-
fendants moved for a new trial, on the grounds, that the
above instructions were erroneous, and that the verdict was
against law and against the evidence in the case.

Aug. 4th,
1832.

*F. Dexter* and *W. H. Gardiner*, for the defendants, in-
sisted, 1. that the verdict was against the evidence ; and
2. that the instructions of the judge had a tendency to mis-
lead the jury.

They argued that the evidence did not prove a construc-
tive total loss. To the point that in ascertaining the amount
of the loss, the sums charged in the plaintiffs' statement,
for insurance against plunder and weather, were not to be
allowed, for that those risks were covered by the policy,
they cited 3 Kent's Com. 256 ; *Pelby* v. *Royal Exch. Ass.
Co.*, 1 Burr. 341 ; *Ellery* v. *New England Ins. Co.*, 8 Pick.
14 ; *Bondrett* v. *Hentigg*, 1 Holt's N. P. Rep. 149 ; *Bridge*
v. *Niagara Ins. Co.*, 1 Hall, (New York) 423 ; *Richardson* v.
*Maine Ins. Co.*, 6 Mass. R. 120 ; *Amory* v. *Jones*, 6 Mass.
R. 321. That the voyage was not broken up by the injury
sustained, 3 Kent's Com. 265, 274 ; *Murray* v. *Hatch*, 6
Mass. R. 465 ; *Bryant* v. *Commonwealth Ins. Co.*, 6 Pick.
131 ; *Schieffelin* v. *New York Ins. Co.*, 9 Johns. R. 21 ;
*Wilson* v. *Royal Exch. Ass. Co.*, 2 Campb. 623 ; *Ludlow* v.
*Columbian Ins. Co.*, 1 Johns. R. 335 ; *Patrick* v. *Commer-
cial Ins. Co.*, 11 Johns. R. 9 and 14. That the master of
a ship is authorized to sell the cargo only in a case of ne-
cessity, and not upon the ground of mere expediency, *Gor-
don* v. *Mass. F. & M. Ins. Co.*, 2 Pick. 249 ; *Fanny and
Elmira*, Edw. Adm. Rep. 117 ; *Wilson* v. *Millar*, 2 Stark.
R. 1 ; *Underwood* v. *Robertson*, 4 Campb. 138 ; *Cannan* v.
*Meaburn*, 1 Bingh. 243 ; *The Schooner Tilton*, 5 Mason, 465,
Abbott on Shipping, (4th Amer. edit.) 243 ; 3 Kent's Com

134 ; *Hall* v. *Franklin Ins. Co.*, 9 Pick. 466 , *Somes* v. *Sugrue*, 4 Carr. & Payne, 276 ; *American Ins. Co.* v. *Cen-'er*, 4 Wendell, 52 ; *Scull* v. *Briddle*, 2 Wash. C. C. R. 150 ; *Freeman* v. *East India Co.*, 5 Barn. & Ald. 617 ; *Robertson* v. *Clarke*, 1 Bingh. 445 ; *Patapsco Ins. Co.* v. *Southgate*, 5 Peters, 605 ; *Mordy* v. *Jones*, 4 Barn. & Cressw. 394.

*Webster* and *S. Hubbard*, for the plaintiffs, cited on the question of the master's authority to sell,- *Milles* v. *Fletcher*, Doug. 231 ; *Gernon* v. *Royal Exch. Ass. Co.*, 6 Taunt. 383 ; *Read* v. *Bonham*, 3 Brod. & Bingh. 147 ; *Hughes*, 402 ; *Gordon* v. *Mass. F. & M. Ins. Co.*, 2 Pick. 249.

PUTNAM J. delivered the opinion of the Court.* Three *March 25th.* juries have found verdicts for the plaintiffs, on the ground that the master was authorized and that there was a necessity to sell the cargo, and terminate the voyage at the Wash-woods ; and we are now called upon to set aside the last verdict and to grant a new trial.

If a verdict were rendered upon a mere matter of fact found clearly against the weight of the evidence, the Court would send the cause to another jury, if the circumstances should, in the exercise of a sound legal discretion, require such a revision. *Keble* v. *Arthurs*, 3 Binn. 26 ; *Mitchell* v. *Mitchell*, 4 Binn. 180 ; *Tindal* v. *Brown*, 1 T. R. 167 ; Bac. Abr. *Trial*, *L* 1 ; 1 Sellon's Pr. (1st Amer. edit.) 484 ; *Steinmetz* v. *Currey*, 1 Dallas, 234 ; *Regina* v. *Bewdley*, 1 P. Wms. 212 ; Tidd's Pr. (2d Am. edit.) 816. And if a second jury should confirm the verdict, this Court would, as a general rule, be disposed to acquiesce in the second verdict ; as it would be within the prescribed right of the jury to decide upon the mere matter of fact. But after all, the granting of a new trial is a matter of legal discretion. It is, as Lord *Mansfield* said, " the attaining the justice of the cause." The reasons must be collected from the whole evidence, and from the nature of the case under all the circumstances. It will be, as it has been, the desire of the Court to establish and confirm verdicts, when it can be done without a violation of the rules of law.

---

* *Shaw* C. J. did not sit in the cause.

Bryant
*v.*
Common-
wealth
Ins. Co

If however the fact to be found by the jury consists of distinct integral parts, some of law and some of fact, which must exist and be proved before such mixed fact can be said to be legally established, in such case a verdict finding the fact, without the evidence of such legal pre-requisites, would be a verdict against law, and should be set aside *toties quoties*. Bac. Abr. *Trial, L.*

If this were otherwise, it would be in the power of the jury, by a general verdict, to take the law into their own hands ; and the result would be total uncertainty in the ad ministration of justice.

In *Bright v. Eynon*, 1 Burr. 393, Lord *Mansfield* ob-served, that " most general verdicts include *legal consequen·ces* as well as propositions of fact : in drawing these conse-quences the jury may mistake, and infer directly contrary to law." For example, the issue on a plea of *non est factum* is a question for the jury, but mixed of law and fact. Whether the facts touching the delivery of the deed proved that it was delivered as an escrow or absolutely, would be for the Court ; whether the party signed and sealed, would be for the jury.

Fraud is sometimes a mere fact, and sometimes a mixed question of law and fact. Of mere fact, where the question is of the fraudulent intent of a party : as if the inquiry be, whether the assured procured the insurance after knowledge of the loss of the property. It would be a mixed question, if the inquiry were in regard to matters which do or do not constitute what is called a fraud in law. *Foxcroft v. Devon-shire*, 2 Burr. 938. So, reasonable notice is a question which must be found by the jury. But they are to judge of the facts only, and it is for the Court to judge whether they do or do not amount to reasonable notice. Lord *Mansfield* thought it a mixed question of law and fact. *Tindal v. Brown*, 1 T. R. 167. There the court granted a third trial, after two verdicts for the plaintiff. In that case there was no special verdict ; the court pronounced upon their knowl-edge of the evidence offered at the trial.

The court is responsible for the correctness of matter of law, and may not permit the jury, in civil actions, to avoid

it by a general verdict, as they may do in criminal causes. If there is a special verdict, or a demurrer to the evidence, the law upon the facts proved or admitted by the demurrer, must be declared by the court. It is absolutely essential to the proper conducting of the judicial department, that the mere facts should be considered and ultimately settled by the jury, and that the law should be declared by the court.

But where there is no special verdict, or demurrer to the evidence, or case stated upon facts agreed, the court must resort to the evidence given upon the trial; and if such evidence is sufficient in law to warrant the conclusion drawn by the jury, the verdict will be supported; if it is insufficient, the verdict will be set aside; just as it would be if it were against a particular direction in matter of law.

And if the court should instruct the jury in regard to facts which are mingled with legal principles, without the establishment of which a party would not in law be entitled to recover, and the jury should assume such facts to be proved, without the evidence required by the law to prove the same, such a proceeding would be misconduct on the part of the jury, and would require the court to set it aside *toties quoties.*

The plaintiffs claim for a total loss, on the ground that the master, acting with good faith and sound judgment under the circumstances and the necessity of the case, lawfully broke up the voyage at the Washwoods, and sold the cargo for the benefit of all concerned, and that therefore there was constructively a total loss.

It is for the plaintiffs to prove the legal necessity. It is a fact to be submitted to the jury; but it is a question of complex character, compounded of many ingredients or elements, some of which consist of mere fact, and some, of principles or matters of law. The burden of proof is upon the plaintiffs. *Dodge* v. *Union Mar. Ins. Co.* 17 Mass. R 478. They must maintain that there was good intention and sound discretion on the part of the master, and that he was compelled by the necessity of the case to act; that the cargo could not have been sent on to the port of destination without a loss exceeding fifty per cent. For if that could have been done, the law is clear, that the master had

no lawful authority to break up the voyage and sell the cargo, notwithstanding he acted with good faith.

The plaintiffs must prove that the master was authorized thus to terminate the voyage and sell the cargo; for if he was not authorized to act for the owners and underwriters, it would follow that they were not to be bound by his acts.

There was no suggestion that the master had any express authority. The plaintiffs must maintain that the authority was conferred by the operation of the law.

It would be clear, that if the master assumed to act for the owners and underwriters when they were present, or so near as to be consulted in regard to the disposition of the property, his acts under such assumption of authority would not bind them. He might be justified, if the necessity were so urgent as to require immediate action; as if the goods would probably perish or be destroyed before the directions of the owners could be obtained. But if the goods were not perishable or damaged, and might be preserved in reasonable safety until the owners and underwriters could be consulted, he should preserve and guard them; and in such case he would have no more authority to break up the voyage and sell the cargo, than the mate or a stranger would have. And notwithstanding he conducted himself honestly, yet if the other elements which make up this legal necessity were wanting, the owners and underwriters would not be bound. The question therefore is, whether or not there was a legal necessity for the master to terminate the voyage and sell the cargo. The acting merely in good faith and for the interest of all concerned, will not exempt the sale of goods from the character of a tortious conversion, for which the ship-owner and purchaser are responsible. 3 Kent, 134.

The law upon this subject seems to us to be very clear, yet under the peculiar circumstances of this case it may be proper to refer to some of the authorities.

" The voyage is not lost as to the ship, if the master has the means to repair her; nor as to the cargo and freight, if he has the means in his power to send on the one, and to earn the other." 9 Johns. R. 28, *Kent* C. J. for the court. " It belongs to the plaintiff to make out a complete case and

his case is not complete, unless it appear that the voyage was lost by a peril within the policy." Ibid.

In *Wilson* v. *Millar*, 2 Stark. Rep. 1, it was held, that the master has no authority to sell the cargo at a *foreign port*, although it be impossible to prosecute the original voyage, and although a sale of the goods be the most beneficial to the owner. Lord *Ellenborough* said that the master is bound to send back to receive further instructions from the owner, though the consequences may not be so beneficial to the latter. In the case at bar, the master could have given notice to the owners by the regular mail in eight days.

In *American Ins. Co.* v. *Center*, 4 Wendell, 52, (Cases in Error) : " The master is not authorized to sell the ship or cargo, except in a case of *absolute necessity, when he is not in a situation to consult with his owner, and when the preservation of the property makes it necessary for him to act as agent of whom it may concern.*" Per the Chancellor.

*Freeman* v. *East India Co.*, 5 Barn. and Ald. 617. The master has no authority to sell the cargo, except in cases of *absolute necessity*, and if he does, no property passes to the purchaser, although the master acted *bonâ fide*. Trover will lie against him for it. One of the facts there relied. upon by the court was, that the ship was in a British province. The cargo was not perishable, and warehouses might have been had, where the property could have been secured until the owners' directions as to what was to be done should be received.

Abbott on Ship. (4th Amer. ed.) 241. " The disposal of the cargo by the master, is a matter that requires the utmost caution on his part. *He should always bear in mind, that it is his duty to convey it to the place of destination, by every reasonable and practicable method.*"

Ibid. 240. " If the cargo be of a perishable nature, *and there be not time or opportunity to consult the merchant*, he ought either to tranship or sell it, according as the one or the other will be most beneficial to the merchant."

Ibid. 243. " Transhipment for the place of destination, if it be practicable, is the first object, because that is in furtherance of the original purpose." — " *The merchant should be*

*consulted if possible.* A sale is the last thing that the master should think of, because it can only be justified by that necessity, which supersedes all human laws. If he sell without necessity, the persons who buy under such circumstances will not acquire a title as against the merchant, but must answer to him for the value of the goods."

The learned and very distinguished editor remarks in note 1, — " When a ship is driven out of her course by stress of weather, the charge of the cargo devolves on the master, *whose duty it is to take care of it. In such case he has power to sell goods which are perishable or damaged. But he has no right to sell goods which are in good condition and not perishable, without the orders of the owners, to whom he is bound to give immediate information.*" Such authority is denied to exist, in the country where the owners live. *Scull* v. *Briddle*, 2 Wash. C. C. R. 150.

The courts have endeavoured to limit and guard this branch of the mercantile law with the greatest care. The strongest language has been employed We refer generally to the cases cited at this trial, and to tne opinion delivered in this case, in 6 Pick. 131.

This Court declared, in *Hall* v. *Franklin Ins. Co.*, 9 Pick. 478, that the necessity which will justify the master of a ship in selling her, is one *in which he has no opportunity to consult the owners or insurers, and which leaves no alternative.* " There must be something more than expediency in the case ; the sale should be indispensably requisite. The reasons for it should be cogent. We mean a necessity which leaves no alternative ; which prescribes the law for itself, and puts the party in a positive state of compulsion to act. *The master acts for the owners or insurers, because they cannot have an opportunity to act for themselves. If the property could be kept safely until they could be consulted, and have an opportunity, in a reasonable time, to exercise their own judgment in regard to the sale, the necessity to act for them would cease.*"

We do not inquire whether it was expedient to break up the voyage and sell the cargo, but whether there was a legal necessity to do so. The cargo was landed without any considerable damage. It might be that the owners would be

willing to terminate the voyage there, rather than prosecute it to the port of destination. The price, for example, might be more than they would probably get at the port of destination. But the underwriters have no concern with that matter. They are to be held if the plaintiffs sustain the legal necessity, but not otherwise.

We proceed to consider whether the cargo might have been sent from the Washwoods to Castine, the port of destination, at a loss not exceeding fifty per cent.

The evidence as to the *precise* amount of the cost of transportation by land to Norfolk, and of transportation thence to Castine, is conflicting. And if the master had suffered the cargo to remain at the Washwoods, and the cost of transportation to Norfolk had been somewhat more uncertain, the opinions of witnesses as to the *probable* cost, would have been entitled to more weight than they can be when contrasted with the positive evidence of the *exact amount* which the purchasers have actually paid for the transportation to Norfolk.

We have examined carefully the mass of evidence produced at the last trial, and we think that it is beyond any doubt, that the expense of sending the cargo to Castine by way of Norfolk would be less than fifty per cent. We know indeed that some one or more of the witnesses said they would not have carried the cargo to Norfolk for fifty per cent, considering the great danger of plunder on the beach and on the road. But these extravagant assertions are rebutted by the proof of the actual cost. John Cornick, a witness produced by the plaintiffs, testified that he was willing to contract to transport the cargo for one and a half cents per pound, the owners taking the risk of weather and plunder; which would have been less than one sixth part of the value. The jury were probably governed much by the great danger of plunder, without considering that the cargo would have been *at the risk of the underwriters* on the way to Castine, as much while it was on the road, as when water-borne.

This extra charge for insurance against plunder &c. on the way from the Washwoods to Castine, is contained in the plaintiff's statement of their loss, which we find among the papers of the case. They estimate this insurance at $4,562·20,

and the transportation to Norfolk and thence to Castine, charges at the Washwoods, commissions on sales also, and commissions for securing duties by bond, at $5,733·44. They take the invoice value on the beach, $11,851·31, one half of which is $5,925·65½; which would make the expenses of prosecuting the voyage, (rejecting this extra charge for insurance) $192·21 less than fifty per cent. of the value of the cargo. Upon this view of the case, upon the plaintiffs' statement there was not a loss of the voyage.

But when the particulars of their estimate are considered, the result is much more against the claim. The transportation is estimated at 3 cents a pound, amounting to $3,650·70. But Banks (whose deposition was produced by the plaintiffs) proves that the cost was 1½ cents a pound, which would be $1825·35. The estimate contains a charge for commissions on sales, which would not have been paid if there had been no sale, $590·05, besides an over-estimate of freight from Norfolk to Castine, of several hundred dollars over the amount which, from the evidence in the case, it would have cost And yet with all this straining, the expenses (striking out the charge for insurance against plunder) would fall short of fifty per cent. It is very clear that there was no legal ground to claim as for a loss of the voyage.

But there is another point to be considered. Was there any necessity upon the master so precipitately to break up the voyage and sell the cargo, without directions from the owners?

That would depend upon the nature and situation of the property, and the means of communication with the owners. The cargo was not perishable. Spratt, the plaintiffs' witness, swears that it was all safely landed on the beach, except one or two bags, or perhaps more, which got wet on being put on shore; that as the cargo was landing, and afterwards, it was guarded by some of the people at the Washwoods, who were hired by the master for that purpose; that the vessel got on shore on Wednesday morning, December 29th, and the master despatched a messenger to Mr. Cornick, one of the commissioners of wrecks, who arrived there on Wednesday afternoon. Mr. Soutter swears that the cargo was well protected from the weather by a well constructed tent formed

of the vessel's sails, and men under arms guarded it from any theft. " The cargo was put into the care of the commissioners of wreck, who continued the armed guard." These officers are clothed with all necessary authority for the purpose, and are, according to the laws of Virginia, to give bond for their fidelity. Mr. Sampson, one of the plaintiff's witnesses, swears that they command respect and attention from all persons.

Mr. Banks, a witness for the plaintiffs, who was employed by the purchasers in the removal of the cargo, swears that he knows of no damage done to the coffee after it was got out of the vessel and put on the beach and secured, but it received some damage after the sails were sold and removed, which had before secured it.

The sale was on the 11th of January; which was three days after the letter of the master, giving the information of the loss, was received at Boston. The letter was dated the 30th of December 1824, was mailed on the 1st of January 1825, and received on the 8th.

If the sale had been postponed five or six days, the owners might have been present at the sale, or given instructions. We do not think that any good reason can be given for the omission to consult them. Mr. John Cornick, one of the commissioners of wrecks, called by the plaintiffs, testified personally at the trial, that he should not have left the cargo on the beach four weeks; he might *think it safe for twenty days.* Other witnesses thought it could have been kept there safely for a much longer time. And if there were any doubt about its safety there, Mr. Cornick says it could have been removed to some house, or upon the hills, out of the reach of the sea  After the sale, it was all removed from the beach in two or three days.

Taking the reduced period of twenty days, as the extent of time that it would have been safe on the beach, guarded and covered as it was, even that period would have been amply sufficient to have obtained the directions of the owners. They might have been upon the spot and have acted for themselves. Mr. Cornick states " that owners have come on not unfrequently and stopped wrecked sales." The owners

47 *

would without doubt have attended, and they would have either stopped the sale or secured the proceeds. But that would not have so well suited the ultimate views of the master. He arranged matters so as to get the money into his pocket and run off with it. His receipt is dated the 15th of January, 1825, which was four days after the sale. This fact excites in every fair man, indignation towards the master and great sympathy for the owners. It was a case peculiarly hard upon them, for they had no personal appointment of this master. He was appointed by their agents abroad. But this does not vary the rule of the law. The underwriters are, by the express terms of the policy, discharged from losses arising from the barratry of the master, if the assured were owners of the vessel, and they were the owners of the vessel.

The verdict for the plaintiffs in effect affirms, that there was an absolute necessity to break up the voyage and sell the cargo. How can we confirm it, when it is clearly proved that the cargo might have been carried on to the port of destination at an expense of less than fifty per cent ? The jury probably mistook expediency for necessity.

Again, the verdict in effect affirms that the master had authority to sell, because the goods could not be preserved and kept until the owners could have been consulted. How can we confirm a verdict which assumes such a fact directly against the evidence ? This fact is not to be settled by conjecture, as the question of fraudulent intent may be. The course of the mail and the nature of the cargo, and the evidence given by the plaintiffs themselves, put this matter beyond any question.

It is possible that the master acted like an honest man when he put an end to the voyage and sold the cargo, and that he commenced rogue or felon as soon as he got the money. But it is not possible to believe, from the evidence, that the cargo was perishable, or that it could not have been kept in safety until the directions of the owners could have been obtained, touching the disposition of it. As before said, it lay at the Washwoods at the risk of the underwriters. " A man is not, *quia timet*, so to compromise the interests of other persons, merely on the ground of what passes in his

own mind." *Somes* v. *Sugrue*, 4 Carr. & Payne, 283, *per* Bryant
*Tindal* C. J.

We cannot confirm the verdict, unless we permit the jury to assume, without sufficient evidence, the facts required to make a legal necessity, or permit them to reverse the established rules of the law upon that subject.

And being all clearly of opinion that the verdict is not warranted by the law and the evidence in the case, it must be set aside and a new trial granted.

Bryant<br>
*v.*<br>
Common<br>
wealth<br>
Ins. Co.